May it please the court my name is Rachel Goldberg and I represent the Secretary of Labor. Is this too loud? I'd like to reserve five minutes of my time for rebuttal. Okay, it counts down. Housekeeping question, who's Perez? He's the new... He's the current Secretary of Labor, your honor. And Seth Harris is out of the case? Correct, he was the acting secretary. The informants privilege is a privilege. And the district court here, the district court's rulings are particularly harmful to that privilege. The district court committed three major errors here that warrant mandamus. Although the state claims that they're asking for only neutral information, in fact, answering these interrogatories would reveal the identities of the 250 employee social workers who provided information to the government but who explicitly requested that their identities remain confidential. So that was the first error. The court misconstrued the nature of what was being the court improperly focused, I should say, on what was being sought rather than what would be revealed in the response. The second clear error was in drastically limiting the scope of the privilege, such that under the district court's reasoning the privilege applies, the informants privilege applies only to employees who precipitated the lawsuit by filing a complaint with the department. In this case, that would be one individual out of 400 people who provided information to the department. Now, DSHS maybe, I would argue, explicitly acknowledges that as too narrow of an interpretation. And instead, they argue that the privilege should be limited to people who provided information to the department during the department's investigation but before filing of the complaint. Either reading of the scope of the privilege is too narrow. It is not supported by the case law. The case law makes no distinction between the time in which the person, employee provides information to the department. The privilege should really apply throughout the entire course of the case through litigation, through investigation and litigation. And that's the purpose of the privilege is what necessitates the scope of the privilege. The purpose of the privilege is to encourage the enforcement of the FLSA by encouraging employees to provide information to the government. And of course, the government depends heavily on employees providing that information. We just can't enforce the FLSA without information from employees. And for them to be able to provide that information, they need to be able to know that they can remain anonymous. And from their perspective, there's no difference between providing that information during an investigation versus providing that information after the secretary's filed a complaint. From the employee's perspective, they are still putting themselves out there by providing information and they still want to remain anonymous. Is there anything in the case law that tells us whether someone qualifies as an informer under the common law doctrine, depending on when the information is provided? None of the cases address that. None of the cases specifically looked at when the information is provided and drew any sort of line one way or the other. Granted, none of the cases specifically said it applies for information given during litigation, but they just didn't hold one way or the other. They weren't called upon to address that issue. And it's clear, I would argue that it's clear from the way the informant's privilege is discussed in all of the case law, that the rationale underlying the privilege is what motivates, is what determines the statute. So the rationale underlying the privilege is to encourage enforcement of the FLSA, and clearly enforcement obviously doesn't stop once a complaint is filed. It continues. The secretary continues to gather information from employees, and there's no reason why that bright line of filing a complaint should somehow eliminate the protection of the informant's privilege that it provides to employees who, from their perspective, are just as vulnerable to retaliation during litigation as before litigation. So if an employee voluntarily comes to us and wants to offer us information about the practices of its employer, it would run counter to the privilege for us to have to tell that employee, well, I'm sorry, it's now, we've already filed a complaint, you know, we can't take your information unless you're willing to have your identities known. If you'd talked to us two weeks ago before we filed this complaint, we could have. I mean, it's very arbitrary. If you'd talked to us two weeks ago, you would have been protected by the privilege, which of course is not absolute. I mean, even when the privilege attaches, the other side's entitled to the information, including the identity, depending on the fairness or unfairness of withholding the information. Correct. It is absolute, and the secretary acknowledges that. It is not absolute. It is not absolute. It is a qualified privilege. But it does not give way during the early part of litigation, at the exchange of witness lists, when the secretary has determined who, in fact, he will call as witnesses. Those witnesses, to the extent they're informants, to the extent they gave information to the secretary, their identities are then disclosed. Yes. Well, but it seems to me that this may not be relevant to what's in front of us. It seems to me that the identities are not limited to the identity of those who would testify on behalf of the secretary. It seems to me that if the secretary chooses not to put on, that in fact have information relatively favorable to the other side, and those are the ones they really want to know about. So it can't just be whether or not the identity of those who are going to, those who identified as witnesses come forward. It's a broader qualification than that. It has to be. Well, I don't, I'm not sure, in that we, for example, the 250 witnesses, I'm sorry, the 250 employees here who do we, we do not plan to call as witnesses at this point, that their identities would need to be disclosed. I mean, the... Well, it depends on the operation of the qualification of the privilege. I don't have to say, I'm not saying they have to be, but I think whether their identities must be revealed will be dependent on the balancing process that the privilege sets out. Correct. And it is a balancing. And at all times, though, the employer has to show a substantial need for the information sufficient to overcome the privilege. Yes, the privilege, the interest in the privilege decreases as you get closer to trial, but it's still the employer's burden to show a need for this information. And I think it's important to keep in mind in an FLSA case, the employer has access, as the employer, to all of its employees. It can gather information. I mean, it has more access than we do in many ways. It can gather information from its own employees. Many courts have looked at that fact as relevant. Now, as I look at what the district court did, the district court kind of did belt and suspenders, saying the privilege doesn't attach because these people came forward later, but even if the privilege did attach, as the district court balances it out, we, I think we should reveal the identity. Could you address the way the district court addressed this sort of balancing as to qualified privilege? Sure. And I do think that was an alternative conclusion that the district court reached. And it was stated in a very conclusory manner. There was the State here really has to make a showing of need for this information that overcomes the interest in the protection of the identities of these informants. And the State just hasn't made any showing. The district court didn't point to any showing. The only thing the district court pointed to as the reason for the State's need for this information was to rebut our use of representative testimony. And we've already, you know, we've already given the State names of the 150 employees who have authorized us to release their names and who are willing to testify. If the State needs to attack the representative nature of the employees we put on for representative testimony, it has the substance of the information provided by the non-testifying informants. It has all of the information that those people provided to us. The State has already. The only thing it does not have is the people's names. To rebut the representative testimony, they don't need the people's names. They have the substantive information. So they can attack, if they think that our representatives are not truly representative, they have substantive information to be able to attack that, that we've provided them, not to mention their access as an employee. The State has represented that there will be no retaliation against these employees. What do we make of that? And the district court credited that. What do we make of that? And I certainly don't mean to impugn the State or to suggest that they intend to retaliate, but the privilege is premised on the notion that the relationship between employees and employers is a very sensitive one. Employees are very sensitive to their vulnerability to retaliation, and therefore there's no need to show that there is, in fact, retaliation. The privilege attaches whether there is or is not retaliation. So are you asking us to rule as a matter of law that the pledge of no retaliation has no force and effect at all? Yes. Yes, Your Honor. All right. It has no relevance in determining whether the privilege attaches. No court of appeals has ever said that the privilege depends on there being an actual threat of retaliation. And in fact, several courts have noted that the privilege does not depend on that. And from the employee's perspective, I think it's important to note, you know, that they're, we need them to come forward with information to be able to enforce the FLSA. And from their perspective, they don't, they know that they're legally protected from retaliation, but they still want confidentiality. They're still nervous. So I think a commitment by the State to not retaliate, well, you know, I take it in good faith. I don't know that they would necessarily, and they're the ones who we need the information from. So I think it's important to keep in mind that the privilege is tied to getting the information, getting information from employees who are very aware of their standing among, as an employee, and that they're vulnerable to retaliation. It can be very subtle. Even though the State might have guaranteed that it will not retaliate, you're saying that the State's good faith guarantee may not, in fact, be something the low level of retaliation, the sort of the workplace retaliation that might or might not take place, the State may not have full control over? Yeah. I mean, it's a large workforce. And, you know, I certainly understand they would not intend, you know, upper-level management would, I'm sure, tell them, you know, there's absolutely no retaliation permissible here. But the job is to keep it going prospectively, so that employees know that they're protected and that they can give information and remain confidential. Did you want to save some time? Yes, I did. Thank you very much. Good morning. May it please the Court, my name is Kara Larson. I'm with the Attorney General's Office of the State of Washington. We're here today because the Secretary has sought the extraordinary relief of Mandamus to overturn a discovery order by the district court judge, which is clearly in the judge's discretion to... Well, you know, we wouldn't be here on Mandamus if the Supreme Court hadn't decided that darn Mohawk case, making interlocutory appeals on privilege impossible. That's true. Mohawk League Arbiter did... We had lands with law in interlocutory appeals until the Supreme Court changed it. So that's why we're here on Mandamus, I get it. That's why we're here, but either way, you know, it's an extraordinary remedy, and before it can be granted, this Court has to be firmly convinced that the district court has erred, and that the right of the Secretary to this writ is clear and indisputable. And there are two things going on here. One is the Secretary's position as to what is the extent of the privilege, who does  it, and the other is the balancing that the district court did that, you know, regardless of who this privilege covers, at some point, the district court gets to balance the needs of the defendant to prepare for trial against the public policy of the privilege, and can, as you said, it was not absolute, can make a give way and can require that to happen. And that's what happened here. Back in 2010, we were two months away from    getting fast and furious. The Secretary moved for a protective order on the informant's privilege against the information that the State was requesting. And what DSHS was looking for was essentially as to each person upon whose behalf they are proceeding, which is nearly 2,000 employees, tell us basically the damages information. What are the hours they worked? What are you claiming for damages? And that's required by Rule 26. And we were required to provide that information to the State. They said, no, this is privilege, because everyone we talked to, 400 people approximately, we consider to be informants that are covered by this privilege. So you don't get to know what we're asking. You don't get to know our damages. We don't get to know. Wait a minute. My understanding from the Secretary is that they gave you everything they have except the names of the individuals. Am I wrong? Or did I mishear? Or are they misrepresenting?  Well, I think they're not giving you the whole story. They gave us certain redacted statements, because after they filed the complaint, the attorney from the Seattle office, who was representing the Department of Labor at that time, sent a questionnaire and received 370-some-odd responses back. When they gave us that information, they heavily redacted. They not only redacted the names, but they redacted the location that the person worked, what their job was, what    their job title was. They redacted everything they considered to be identifying information. But the problem with that is that when, and this is where the district court focused its balancing test, they want to prove their case using a representative sample. DSHS has over 40 field offices. Again, almost 2,000 employees at issue here. When you have that many field offices, they're, then they decide, well, we told you we're going to have 150 people testify, and we're    going to take a sample, and what they are basically doing is saying, because we don't want to tell you anything else, because we've only got this small subset of people who have given up their names, that's all you get to know. So that, suddenly, this case is only about 150 people. But they want that information. They want to cherry pick, you know, the people who will testify to the most probably egregious, you know, perceived violence. And then that's going to apply to 2,000 people, and we get the chance to rebut that. So, what do you think about when the state is going to have to pay money, if and when it does? My understanding is they will be seeking back wages, but they want to calculate those back wages for each of the people that they, on Exhibit A to the complaint. They are going to calculate that by putting on a subset of people that they are going to claim are representative, and just, for instance, say they say they work an average of, you know, five hours a week of overtime. They are going to say, Your Honor, the average of all these people who testified, maybe some testified two, maybe some testified seven, but the average is five. Take that five hours and pay everybody five hours of overtime per week for whatever period of time, regardless of the actual circumstances of the individual employee. Isn't that what Mount Clemens allows? Mount Clemens does allow a relaxed measure, a relaxed burden of proof, because the way Mount Anderson versus Mount Clemens went is where, in that case, the employer kept no time records, the damages were allowed to be testified to by the employees as a matter of fair and reasonable inference, and so they didn't need to have documents, but they could testify as to a  And so there has arisen this idea that you can reach that fair and reasonable inference through a subset of employees. What we have going on in this particular case, though, again, I reiterate, we have over 40 field offices, and there are distinct differences among all those field offices. So if they decide that they are going to say that this person from Seattle is from a completely different work environment and is not a fair representative of a person working in Walla Walla, and because we don't, we have all of what they claim of the people they've talked to, the hours, but they redacted all of the information about where they work, and so without that information, we have a difficult, unless we go talk to 2,000 people, which is what they say we should do, which we believe is an onerous burden and the district court believed it was an onerous burden, then we don't know which ones to call from Walla Walla that said they had a different experience because they promised them confidentiality and won't give us the information in response to our interrogatories. Do you concede that there's a violation floating around in this case of the Fair Labor Standards Act in terms of record keeping and overtime pay? No, we concede no violations of the Fair Labor Standards Act. So just getting back to the balancing, this isn't a clear error standard, and as Judge Trott previously said, this is not a seven-day-old stinking fish. The district judge did his job. He did the balancing. He listened to our arguments and our pleadings on what the need for the information is relative to the district court. We have different work locations because everyone has a different supervisor in their office. They have different caseloads. They have different demographics. There's lots of things going on because the state of Washington is not homogenous. There's a very urban side. There's a very rural side. There are different needs. The social workers have different caseloads and they have different working conditions. Let me ask you this. Of the 150 employees who are fully identified, where are they from? Are there some from Walla Walla? Are there some from Yakima? Are there some from Tri-Cities? I mean, are there some from Seattle? I assume they're scattered. They're not just all in Seattle. They're fairly scattered, but there are some offices that aren't represented at all by those 150. How many? I don't know. I haven't added that up. I'd have to go back through the list and compare. Because I'm hearing you say it's kind of like a parade of horribles that Walla Walla is different. I understand Walla Walla is different. But do we have any of the 150 that are identified? Is any of them from Walla Walla? Yes, but I don't believe there's any from Sunnyside. And I don't believe there's any from various other of the smaller offices. Tonino. There's probably none from Tonino. Probably not. I mean, again, I'd have to go back through that list and compare it to all the locations of the field offices. Probably not from Hump Tulips either. I'm sorry? Probably not from Hump Tulips either. I don't know that we have an office in Hump Tulips. But be that as it may, the standard here is the clear error standard. And the cases definitely hold that as to the clear error standard, it is highly deferential to the district court judges' rulings and management of discovery. What are we to make of the state's guarantee or statement, I'm not sure what to call it, representation that there will be no retaliation? And I take it absolutely at face value and in good faith that the state does not want there to be retaliation. In practical terms, how strong can that guarantee be? I think it can be very strong because, again, as I state in my pleadings, this is mission critical work to the state of Washington, and the state of Washington is, DSHS is not, has absolutely no interest in doing anything other than treating its employees fairly and equitably. But that's the high level. What about the guy who's the supervisor out in, I don't know, Walla Walla, and I'm totally making this up, I don't know the supervisor's name, I know nothing about the supervisor in Walla Walla, who gets a little grumpy when his employees turn him in. And, of course, he's been instructed by you, don't retaliate, but nonetheless he's a little grumpy. I don't want to be that guy's employee if he's a little grumpy now that he knows that I turned him in. Well, as a practical matter, he is not going to know because this kind of information and this kind of case... Well, he will as soon as the name is made public. It's going to be made public to the attorneys and to high level management. It's not going to be disseminated throughout the field office saying, oh, guess who from your office, you know, the most that will happen is if they get subpoenaed, that might give an inkling that if they're subpoenaed to testify at trial, that might give an inkling that they have some knowledge pertaining to the case. But there's absolutely, it's not going to be a practical reality that any information about these people is going to reach that lowest level at the field office supervisory level. Doesn't this lawsuit accuse supervisors of defective record keeping to the detriment of employees? Inadequate record keeping, not necessarily of specific supervisors, but of the system that the department had in place of what is called the exception time keeping system. Well, somebody has to keep these records. You say humans don't do it? Humans do do it. Payroll does it. And under the exception... Where does the input information come from? There's no intermediate between the employee and a machine? There's the employee and then there are each, at the time relevant to this case, there were time keepers and there were actual employees in each office whose job it was to process leave requests, overtime requests, and what the exception time keeping system that they had in place at the time called for was we start at 40 and if you take leave, then we do the adjustment, and if you put in for overtime, we do the adjustment, but we start at 40. Who's the we? Is the we a person? The we is DSHS as policy. What Judge Fletcher is getting at is that the top may say we're going to make sure that there's no retaliation, but then it seems to me that down below you're alleging that somebody did a bad job resulting in the failure to pay these people overtime. That's what you're dealing with. And so isn't that a person who's in the gun sights of this case? Potentially. It would seem to me that then you might want to discipline people inside your department who failed to keep proper records resulting in this lawsuit and the payment of information. Well, the problem is that individual people didn't keep improper records. What the Department of Labor came in and said was your system, the system that by many state agencies, was an inadequate system, this exception system where you only count leave and overtime to vary the basic rate of pay and the basic number of hours worked. What happened in 2008, though, is in consultation with the Department of Labor, the state changed its record-keeping system, and now employees fill out daily timesheets, and they record their hours on a daily basis. And part of the problem here is because there has always been a policy and a term of the collective bargaining agreement that employees cannot work overtime without preapproval, that what is being alleged here is employees were working that overtime without getting preapproved, and that's the allegation here. So there was no records because employees weren't doing what they were supposed to do to get the approval, so there were no records if, in fact, they were working overtime. All I'm doing is exploring whether or not this Pledge of No Retaliation has any teeth in it. Well, I believe it has teeth, but obviously I cannot guarantee that somebody far down the chain is not going to do something, but if we determine that that happens, of course there will be immediate discipline for that supervisor. Yeah, but aren't employees just normally wary of retaliation when they get involved in something like this?  Now, during most of your argument, we've been focusing on the balancing of assuming the privilege applies. What's your response to the question, did the district court err in saying that the privilege simply does not apply to those who have come forward after the filing of the lawsuit? Well, that's our position, is that that is the correct state of the law. And do you have any case law that supports that? Well, the problem with the cases is that they don't hold, there's not a single case that holds that. There's a description of what was going on, but it was never a litigated issue resulting in a holding to that degree. Well, that's true, but the cases that go into enough detail specify that what is being sought by the issue that's being addressed is the identity of the informant who provided information during the investigation. That's the vast majority of the cases, and I string-sided them in my pleading. And I think what that leads you to infer is that no one ever, it just didn't make any sense for someone to say that after the filing of the lawsuit, when you're simply conducting discovery and the attorneys and paralegals are gathering facts from trial preparation, that suddenly you're still in this idea that there's an investigation and you've got informants. I think that the thing to draw from the cases and the fact that this has never come up before is because that's absurd. I mean, that's patently absurd because it completely obliterates discovery, to have everyone that the lawyers and paralegals talk to in trial preparation is suddenly somehow informing their employer for violations of the law when all of the cases recognize, particularly the criminal ones where this came up, this is what leads to an investigation that leads to an enforcement action. And that's the context of the informant's privilege, and I think that that's why none of the cases talk about the time, because I think it went without saying, it was axiomatic that we were only talking about informants as being those people who participated in the investigation by a wage and hour investigator. As somebody who was involved with Roviaro for years in different contexts, what you're saying makes no sense at all. An informer privilege is an informer privilege is an informer privilege. And if it applies, it doesn't seem to me to make any difference when that situation pops up in the case. Well, I think it does matter because the people that the Department of Labor contacted through a questionnaire was part of gathering facts for trial preparation for discovery, and so now you've got the rules of discovery in play. And, yes, privilege is an exception to discovery, but broadening the privilege to the point where everyone they talk to is now governed by this privilege completely swallows discovery. But I guess our major point, though, is that regardless of how you define informer, that's not really going to matter in the end, because in the end, the district judge gets to decide, using the balancing test, if the privilege should give way. And so no matter who you're saying is an informer, at some point, as happened here, the district judge said, no matter who you have identified as an informant, the department has convinced me that they have a compelling need for this information, and I am going to grant their motion to compel. And there is no clear error in that, because that is what the judge is charged to do. That's completely within his discretion to do. And that's another reason why the basic privilege can attach at any stage of the game, because there's always this fallback. You can do the balancing. If you have to turn over the information, you do. And if you don't, you don't. And that's right. I guess to that extent I would agree with you. That's why it's not relevant for this case, in the end, who is determined to be an informer, because no matter who's an informer, the privilege gives way. Do you think the district court's discussion of the balancing issue was all that informative? I think the district court judge simply used all of, in our pleading, we argued at length in our motion to compel, we argued at length about why we need this testimony in terms of the number of field offices, the various demographics, the working conditions, the case loads, the different types of duties involved. And we needed all of that information. We needed to have information about all of those factors in order to rebut what they present as their theory of the case, which is going to be proved based on representative testimony. And so your position is even though the district court's discussion was short, it necessarily includes all the information you put before them? It did, because he mentioned that we need it for the representative testimony, and so that, I think, carries forward everything that we argued in our briefing about what was needed to rebut their theory of the case. Okay. Thank you very much. Thank you very much. And you've saved some time. Thank you. Turning back to the balancing. Let's assume for the purposes of right now that the privilege attaches and we're talking about balancing. I do think the district court's discussion was very cursory, and the State has only put forth the representative testimony as the basis for their need. But I think it's important to keep in mind, first of all, that this Court recognizes the use of representative testimony in large cases such as this. In the McLaughlin case, this Court recognized that. And the State keeps coming back to, well, we are going to put on testimony of people from Seattle, and how can that possibly be representative of Sunnyside or Walla Walla? But if they want to say that Sunnyside or Walla Walla or Tukwila, wherever, is not being represented, well, they're the employer. They have access to all of that information. As the employer, they can call their employees who work in those offices. They don't need us to identify their witnesses for them. It's their responsibility. As the district court in the Best Miracle Place in the Central District of California said, while it might be helpful to the defendant to know the informants, it might narrow the pool of people who they might want to depose, that is not a sufficient need to overcome the strong interest in the informants' privilege. And that's exactly the situation here. The State would like to know who these informants are so that it can more easily gather information, but the fact is they're the employer, it's their responsibility, and they have the means to obtain the information that they need to attack the representative testimony that we put on. They also do have the substantive information. The only thing we've redacted is names and identifying information. They don't necessarily have to have that information to attack the representative testimony that we put on. So how does it work? Assume that this goes to trial. You get a judgment of liability. This is an assumption that may or may not prove to be the case. Assume that you get a judgment of liability. How does the payout work? You don't have to have individual employees coming forward. It's just sort of you were an employee, this is the average, and you get it? In this sort of situation where you have a very large group and the defendant and the employer kept inadequate records, which is the case here, that we can't prove for each individual 2,000 employees what they need. And do you anticipate the possibility that the record keeping might be different based upon rural or urban or whatever? Or do you just anticipate that everybody gets 100 bucks sort of across the board? Our plan at this point is likely to put on representative testimony to prove what each person in different and I don't know the case, the underlying merits, well enough to know if Seattle social workers are going to get the same amount as Tukwila social workers. I just can't say one way or the other on that. But it's, you know, it will be our burden to prove that it is representative and it's their right to attack that. And so there's a possibility then of representative of subgroups or regions or whatever, depending on what your proof turns out to be. Okay. Yeah, I don't see why that wouldn't be a possibility. I mean, I'm not the trial attorney, so I certainly don't want to commit to anything here. But I don't see why that couldn't be a possibility. Well, then in trial, how do you sort this out? It seems you necessarily get into individual situations and people are going to come up and be identified in the trial, aren't they? I mean, if you're trying to avoid paying people who got their overtime, you know, unjustly enrich people who don't qualify for it, you've got to get down into the nitty-gritty of the individuals. Well, we do have records of anyone that received overtime, because my understanding of the way the situation worked is an employee could ask permission to get overtime, to work overtime and get it, but I believe that there was pressure on the employees to not ask for overtime, yet they had extreme caseloads and had to get the work done. But whatever overtime they were paid for, no, they're not going to get double recovery for that. That would be subtracted. I mean, I think that would be subtracted out, I would think. So I think the argument is they, and I don't, again, I don't know if it will come down to different regions work different amounts of overtime, because I assume, just naturally, I would assume that the caseloads of a Seattle social worker might be different than. I'm having trouble, even though it seems, I just flat disagree, as I think I probably have already signaled, with the district judge conclusion as to when the privilege attaches. But I'm having trouble, as a matter of mandamus, interfering at this level of detail with what really amounts to the management of the case in terms of who comes forward, who's identified, and so on. I mean, that one's a harder question for me. It is, and district courts do have discretion. But the courts of appeals have repeatedly said that the district court improperly balanced the employer's need in the Ritter case. To go back to what Judge Fletcher said, you know, frequently we get into this, and it's not always clear to me that the litigants understand what the standard review is. We've been told by no lesser court than the Supreme Court that mandamus is a drastically extraordinary remedy, reserved for only exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion. I mean, they even use clear, not just the normal abuse of discretion, but clear abuse of discretion. And so that's a real high hurdle to get across. It is a high hurdle, but as this court recognized, the Mohawk did change the field in that regard, and since Mohawk, this court has granted mandamus in several privilege cases. Well, did Mohawk change the standard review in mandamus? No, no, mandamus is the same. But Mohawk pointed the way to mandamus as a safety valve for particularly problematic rulings. Are you suggesting that it lowered the standard review? Mohawk, no, I don't think it did. No, no, no, no, I'm sorry. I did not mean to suggest that it lowered the standard of review. I think it just pointed what people would have gone to a collateral order doctrine at means of appeal to go to Mohawk instead. And, of course, the standard is very, I'm sorry, to go to mandamus instead. Of course, the standard is very high, but it's not insurmountable, as the Supreme Court has recognized and as this court has recognized in the Perry and the Hernandez case, that when particularly erroneous privilege rulings are at stake that are particularly harmful, mandamus is warranted. And that would be the case here. That's clearly true in the abstract. The question is, what do we do with this one? Right. Right. And, I mean, as this court has recognized, the district court made several clear errors. I would posit that the balancing was also an error, and other courts of appeals have found similar errors. It isn't always a difference. You don't have to always defer to the district court. Why are you afraid to give them this information? Well, I mean, well, what's the problem here? Well, the problem is these 250 employees who came to us with information about the practices of the state as an employer gave us that information with the expectation that their identities would remain confidential for as long as possible. And some of them have changed that. But that's the whole point. You can't guarantee them absolute immunity for as long as possible. Right. And we didn't. We made clear when we gathered information that, you know, we intend to protect your identities, but it can be ordered disclosed by a court. But these are non-testifying. So they know, they know that they may be disclosed to the other side. They know that they might eventually. But they have requested to remain anonymous as long as possible. And that's, the courts recognize that's the purpose of the privilege, is to permit them to remain anonymous as long as possible. How will it, how will it, how will it damage your case to turn this information over? Well. Practically speaking. Practically speaking. To the extent that, I mean, I can more easily see the damages for going forward in other cases. But I'll come back to this case. But obviously in other cases we won't be able to tell employees. Yeah, but this is another case. This is this case. Well, these employees have not changed, they have not authorized the release of their names. They have not said I'm willing to testify. You can release my name. And if they're not going to release. But they've gone forward knowing that they may well have to be revealed. They have. But the potential damages. So it won't damage your case. It won't damage your case at all to have to turn over the information. And it very well may give the other side detailed information it needs that might produce a settlement in the case. I mean, if you show them here are all these violations, here are all these violations. You know, and it's just a question of dollars and cents and bookkeeping. Doesn't it promote the effective resolution of the case? I don't see how actually having this information would promote the effective resolution. They have all the substantive information these employees provided us. The only thing they don't have is their names. I don't see how knowing the names of these 250 employees will encourage the state to be more likely to settle with us. Well, but I've just heard, of course, they don't have the names, but they also don't have identifying information. And I'm not sure sitting here what that identifying information might also add. Like maybe, for example, that particular office or that position within the office that would be identifying information that you've redacted, but that might actually be helpful to them in understanding what's going on. It might be slightly helpful, but I don't think that rises to the level of they have to show the need sufficient to overcome the privilege. Being merely helpful, a generalized need, as the Eighth Circuit has recognized, is not sufficient to overcome the privilege. It has to be a more substantial particular showing. Okay. Thank you very much. Thank you. Thank both sides for their arguments.
judges: Goodwin, Trott, Fletcher